PENNACO ENERGY, INC., Plaintiff,

and

State of Wyoming; Petroleum Association of Wyoming; and Nance Petroleum, Plaintiff–Intervenors,

v.

UNITED STATES DEPARTMENT OF THE INTERIOR, Defendant,

and

Wyoming Outdoor Council; Powder River Basin Resource Council; Natural Resources Defense Council; and Defenders of Wildlife, Defendant–Intervenors.

No. 02–CV–116–B.

United States District Court,
D. Wyoming.

May 30, 2003.

Thomas A. Nicholas, III, Hirst and Applegate, Cheyenne, Charles L. Kaiser, Charles A. Breer, Davis, Graham & Stubbs, Denver, CO, Kirby J. Iler, Marathon Oil Company, Oklahoma City, OK, for Plaintiff.

John S. Burbridge, Assistant Wyoming Attorney General, Cheyenne, Robert Charles Mathes, Laura Lindley, Darin Boyd Scheer, Bjork, Lindley, Danielson & Little, Denver, CO, William Perry Pendley, Christopher T. Massey, Mountain States Legal Foundation, Lakewood, CO, for Plaintiff–Intervenors: State of Wyoming, Petroleum Association of Wyoming, Nance Petroleum.

Greg Phillips, Assistant United States Attorney, Cheyenne, WY, Lori L. Caramanian, Department of Justice, Environmental & Natural Resources Division, Washington, D. C., for Defendant.

Susan Daggett, Earthjustice Legal Defense Fund, Denver, CO, Thomas Darin, National Wildlife Federation, Washington, D. C., for Defendant–Intervenors: Wyoming Outdoor Council and Powder River Basin Resource Natural Resources Defense Council and Defenders of Wildlife.

## ORDER REVERSING THE DECISION OF THE INTERIOR BOARD OF LAND APPEALS

BRIMMER, District Judge.

This administrative appeal comes before the Court on Plaintiff's petition for review of a decision of the Interior Board of Land Appeals ("IBLA"). The IBLA's decision reversed the decision of the Bureau of Land Management ("BLM"), an agency within the Department of the Interior ("DOI"), to issue three oil and gas leases ("Leases"). Upon reading the briefs, hearing oral argument, and being fully advised of the premises, the Court **FINDS** and **ORDERS** as follows:

### Statement of Parties and Jurisdiction

Plaintiff Pennaco Energy, Inc. ("Pennaco"), a wholly owned subsidiary of Marathon Oil Company, is a Delaware corpora-

tion headquartered in Denver, Colorado and doing business in Wyoming. Pennaco was the successful bidder for the disputed federal oil and gas lease tracts located in Campbell and Sheridan Counties, Wyoming, in an area known as the Powder River Basin.

Plaintiff–Intervenor Petroleum Association of Wyoming ("PAW") is a Wyoming trade association. Plaintiff–Intervenor Nance Petroleum ("Nance") is an independent oil and gas exploration company. Nance operates wells in Wyoming and is involved in the exploration and development of coalbed methane ("CBM") in the Powder River Basin. The State of Wyoming ("Wyoming") is also a Plaintiff–Intervenor.

Defendant United States Department of the Interior ("DOI") is an agency of the United States government. The IBLA is an administrative adjudicatory body of the DOI. The Wyoming Outdoor Council and the Powder River Basin Resource Council are parties that opposed Pennaco in the IBLA proceedings. Together with the Natural Resources Defense Council and the Defenders of Wildlife, these parties are Defendant–Intervenors.

This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331. Plaintiff appeals the administrative decision of the IBLA under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–559, 701–706 and requests a Declaratory Judgment under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202. Venue is proper under 28 U.S.C. § 1391.

### Background

In February 2000, the BLM conducted a competitive oil and gas lease sale for lands in the Buffalo Resource Area of the Powder River Basin. At that sale, Pennaco purchased three parcels located in Campbell and Sheridan Counties, Wyoming, primarily for the production of CBM. The Wyoming Outdoor Council and the Powder River Basin Resource Council challenged the sale of these Leases and other oil and gas leases, alleging that the BLM had failed to comply with the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321–4370. These Defendant–Intervenors asserted that the NEPA documents used by the BLM to satisfy its NEPA obligations were insufficient and did not account adequately for CBM development and leasing alternatives in the Powder River Basin. Thus, they alleged that the BLM failed to adequately assess the environmental impact of its Leases in violation of NEPA.

In authorizing the issuance of the Leases, the BLM prepared a "Documentation of Land Use Plan Conformance and NEPA Adequacy" ("DNA") for each of the three parcels. (AR Docs. 187–89). The purpose of the DNAs was to require the BLM to review its existing environmental analyses in order to ensure that its NEPA documents were sufficient to enable it to take a "hard look" at the environmental impacts of the leasing decision.[1] The Buffalo Field Office identified two documents as satisfying its NEPA duties with respect to the Leases: the 1985 Buffalo Area Resource Management Plan and Environmental Impact Statement ("Buffalo RMP/EIS") and the 1999 Wyodak Draft Environmental Impact Statement ("Wyodak EIS"). (AR Doc. 187, pp. 51–52; Doc. 188, pp. 67–68; Doc. 189, pp. 67–68). The Buffalo Field Office concluded that the existing NEPA documentation fully covered the proposed action and satisfied the BLM's obligations under NEPA. (AR Doc. 187, p. 54; Doc. 188, p. 70; Doc. 189, p. 70).

---

1. A DNA is not itself an environmental assessment and contains no independent analysis of the project's impacts. Rather, it is simply a checklist for the agency to use in deciding whether or not additional environmental analysis may be required.

The Acting Deputy State Director of the BLM's Wyoming office dismissed the protest of the Wyoming Outdoor Council and the Powder River Basin Resource Council on April 7, 2000. The State Director's decision held that the development approved in the Buffalo RMP/EIS "includes *all* oil and gas activity," which "clearly includes" the production of natural gas from coal formations as well as oil and natural gas produced from other types of reservoirs, such as limestone and sandstone. (AR Doc. 198, p. 1) (emphasis in original). The decision also disagreed with the assertion that the production of natural gas from coal seams has unique impacts in terms of produced water. (*Id.*). The State Director held that the BLM had taken a hard look at the environmental effects and, through its NEPA analyses, had ensured that it was fully informed about the environmental consequences of the action. (*Id.*, p. 2).

The Wyoming Outdoor Council and the Powder River Basin Resource Council appealed to the IBLA. In April 2002, the IBLA ruled that Pennaco's three Leases had been issued by the BLM in violation of NEPA. *See Wyoming Outdoor Council, et al.,* 156 IBLA 347, 357–59 (Apr. 26, 2002). On June 20, 2002, Pennaco sought judicial review of the IBLA's decision by filing the instant case. On October 15, 2002, the IBLA denied the BLM's motion for reconsideration. (AR Doc. 253).

### Legal Standards

I. *The "Hard Look" Standard for the IBLA's Review of the BLM Action.*

▮ NEPA is a procedural environmental statute, and "it does not require agencies to elevate environmental concerns over other appropriate considerations." *Park County Res. Council v. United States Dep't of Agric., et al.,* 817 F.2d 609, 620 (10th Cir.1987) (internal quotation marks and citation omitted).[2] In accordance with the policy of avoiding "precipitous federal decision making" by agencies, NEPA requires only that federal agencies take a "hard look" at the potential environmental effects of any major federal action. *Id.* The burden is on a challenging party to demonstrate that an agency did not take a hard look at the potential environmental effects of its decision. *See id.* at 621–22.

In *Park County*, the Tenth Circuit applied NEPA's "hard look" test to a BLM decision to issue a federal oil and gas lease. *Id.* at 620–24. The Tenth Circuit held that the "hard look" test is satisfied if the BLM considers generally the potential environmental effects of its actions before issuing a lease and reserves a more detailed environmental analysis until a site-specific drilling proposal is made through an Application for Permit to Drill. *See id.* at 624. Only when such an Application is submitted does the BLM have a concrete, site-specific proposal before it, and only then can a more useful environmental analysis be undertaken. *Id.*

II. *Judicial Review of Agency Action.*

▮ This Court reviews the IBLA's decision under the APA, which provides that "the reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[3] 5 U.S.C.

---

**2.** *Park County* was overruled to the extent that it held that a reasonableness standard of review, rather than an arbitrary and capricious standard, should be used when reviewing an agency determination of the necessity of an initial or a supplemental environmental impact statement. *See Village of Los Ranchos de*

*Albuquerque v. Marsh,* 956 F.2d 970, 973 (10th Cir.1992). In all other respects, *Park County* has not been overruled.

**3.** Within the DOI, the IBLA has *de novo* review authority over BLM decisions. *IMC Kalium Carlsbad, Inc. v. Interior Bd. of Land*

§ 706(2)(A); *see Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1573–74 (10th Cir.1994). This standard requires that the agency provide a reasoned basis for its decision and that the decision be supported by the facts in the record. *Id.* at 1575.

■ Agency action must be upheld if the agency "examined the relevant data and articulated a rational connection between the facts found and the decision made." *Id.* at 1574. The reviewing court "must determine whether the agency considered all relevant factors and whether there has been a clear error of judgment." *IMC Kalium Carlsbad, Inc. v. Interior Bd. of Land Appeals*, 206 F.3d 1003, 1012 (10th Cir.2000) (internal quotation marks and citations omitted). "[I]t is well established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Olenhouse*, 42 F.3d at 1575 (quoting *Motor Vehicle Mfrs. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). The agency's action may not be upheld on a different basis articulated by the government on appeal to the district court. *Black Butte Coal Co. v. United States, et al.*, 38 F.Supp.2d 963, 969 (D.Wyo.1999).

■ Even if the court does not agree with the agency's findings, those findings cannot be set aside if they are supported by substantial evidence. *Four B Corp. v. NLRB*, 163 F.3d 1177, 1182 (10th Cir. 1998). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks and citation omitted).

The reviewing court must engage in a substantial inquiry, *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415,

91 S.Ct. 814, 28 L.Ed.2d 136 (1971), and must strike down any decision in which the agency:

relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Lamb v. Thompson*, 265 F.3d 1038, 1046 (10th Cir.2001) (internal quotation marks and citation omitted).

This Court has held that an IBLA decision is unlawful and must be set aside as arbitrary and capricious if: (1) the IBLA did not examine the relevant data; (2) the IBLA decision is not supported by substantial evidence; or (3) the IBLA did not articulate a rational connection between the facts found and the decision made. *See, e.g., Black Butte*, 38 F.Supp.2d at 969.

III. *The "Rule of Reason" for NEPA Documents.*

■ The reviewing court should apply a "rule of reason" in deciding whether the NEPA documents contain "sufficient discussion of the relevant issues and opposing viewpoints to enable [the agency] to take a hard look at the environmental impacts of the [i]nitiative and its alternatives, and to make a reasoned decision." *Custer County Action Ass'n v. Garvey*, 256 F.3d 1024, 1040 (10th Cir.2001). An EIS "must analyze not only the direct impacts of a proposed action, but also the indirect and cumulative impacts of past, present, and reasonably foreseeable future actions." *Id.* at 1035 (internal quotation marks and

---

*Appeals*, 206 F.3d 1003, 1009 (10th Cir.2000). The IBLA is not required to defer to the BLM's technical determinations. *Id.* at 1013. Thus, as the final decision maker for the DOI,

it is the IBLA decision, not the underlying BLM decision, that is subject to the deferential "arbitrary and capricious" standard of review by this Court.

citation omitted). In reviewing the adequacy of an EIS, the court should examine "whether there is a reasonable, good faith, objective presentation of the topics [NEPA] requires an [EIS] to cover." *Id.* (internal quotation marks and citation omitted).

### Analysis

#### I. *The IBLA Opinion.*

The IBLA stated that the central issue before it was "whether [the] BLM correctly determined that the Buffalo RMP/EIS and the Wyodak EIS adequately analyzed the environmental effects of the proposed inclusion of the affected parcels." *Wyoming Outdoor Council,* 156 IBLA 347, 357 (Apr. 26, 2002). The IBLA noted that for the three Leases issued in this case, the BLM did not prepare an EIS or an EA, but only prepared identical DNAs for each parcel and, "without any site-specific assessments," determined that existing NEPA documents adequately analyzed the impacts of the proposed leasing. *Id.* at 356–57. The IBLA went on to "find significant omissions in both the Buffalo RMP/EIS and the Wyodak EIS which render those documents insufficient to provide the requisite pre-leasing NEPA analysis for the sale parcels in question." *Id.* at 357.

The IBLA determined that the Buffalo RMP/EIS was inadequate to serve as the requisite pre-leasing document under NEPA. *Id.* at 358. Although that document considers the environmental impacts of conventional oil and gas exploration, production, and development, it does not specifically discuss CMB extraction and development, which was not a contemplated use in 1985, but which is relevant to these Leases. *Id.* at 357–58. The IBLA found that the record demonstrates "that the magnitude of water production from CBM extraction in the Powder River Basin creates unique problems and that CBM development and transportation present

critical air quality issues." *Id.* at 358. The IBLA further stated that the BLM itself also acknowledged the inadequacy of the Buffalo RMP/EIS with respect to the analysis of CBM issues. *Id.*

On the other hand, the IBLA rejected the BLM's reliance on the Wyodak EIS. According to the IBLA, the Wyodak EIS is "a project-level EIS designed to analyze the impacts of developing Federal CBM properties by drilling, completing, operating, and reclaiming" CBM wells and related production facilities. *Id.* Since leases authorizing surface occupancy had already been issued, the Wyodak EIS "did not consider reasonable alternatives available in a leasing decision, including whether specific parcels should be leased, appropriate lease stipulations, and NSO [no surface occupancy] and non-NSO areas." *Id.* at 358–59. The IBLA acknowledged that the Wyodak EIS provides a "detailed analysis of the impacts of CBM development," but it found that its "failure to consider reasonable alternatives relevant to a pre-leasing environmental analysis fatally impairs its ability to serve as the requisite pre-leasing NEPA document for these parcels." *Id.* at 359.

While the IBLA analyzed each of the two documents separately, it conclusively found that those documents, even taken together, do not constitute the required hard look at the environmental consequences of issuing the Leases, and that the BLM was required to conduct further NEPA analysis before deciding to issue the Leases. *Id.* Consequently, the IBLA reversed the State Director's dismissal of the challenge by the Wyoming Outdoor Council and the Powder River Basin Resource Council, and remanded the matter to the BLM for further appropriate action. *Id.* Pennaco and the Plaintiff–Intervenors contend that the IBLA's decision was arbitrary and capricious, and that the Buffalo

RMP/EIS and the Wyodak EIS, considered together, provide all the information necessary to enable the BLM to take a hard look at the environmental impacts of its decision regarding the three parcels at issue.

■ The IBLA provides very little rationale or documentation to support its decision. It states:

> We find ... that not only does the record amply demonstrate that the magnitude of water production from CBM extraction in the Powder River Basin creates unique problems and that CBM development and transportation present critical air quality issues not adequately addressed in the RMP/EIS, but [the] BLM itself has also acknowledged the inadequacy of the RMP/EIS as far as the analysis of CBM issues is concerned.

*Id.* at 358. The opinion does not identify the "unique problems" caused by CBM extraction, or the "critical air quality issues" caused by CBM development and transportation. As support for its conclusory assertions, the IBLA cites only newspaper articles, budget request materials, a memorandum segment, and its own prior opinion. *See* (AR Doc. 199, Exs. 3–6, 8–9); 153 IBLA 379, 388 (Oct. 6, 2000). Newspaper articles are not reliable evidence for technical or scientific determinations. The fact that the budget request statements were made in a context of a petition for funds renders its reliability suspect. The statements in the memorandum establish, at most, that the BLM acknowledged the inadequacy of the Buffalo RMP/EIS with regard to CBM effects. Perhaps this is one reason why it decided to draft an entire EIS on CBM effects, the Wyodak EIS.[4] The fact that the IBLA cited only to dubious evidence such as newspaper arti-

cles and budget request materials does not inspire confidence that its opinion was grounded in more reliable data from the record. The evidence cited by the IBLA simply does not constitute substantial evidence.

The IBLA also noted "parenthetically" that the Wyodak EIS "undercuts [the] BLM's claim that the impacts of CBM extraction are the same as those of other methane production." *Id.* at 359. However, the IBLA provided no reasons for this assertion, although it did admit that the Wyodak EIS contains a detailed analysis of the impacts of CBM development. *See id.*

## II. *The Buffalo RMP/EIS and the Wyodak EIS.*

Magnitude of water production and air quality effects were the two factors determinative of the IBLA's finding that CBM extraction, development, and transportation had "unique" environmental consequences. Therefore, the Court will examine the two documents that the BLM relied upon to determine how these factors were covered. The Wyodak EIS was drafted in the context of the Wyodak CBM Project, which refers to proposed additional development of federal CBM properties in the Powder River Basin. The Wyodak EIS analyzes the cumulative effects of: (1) 3,890 productive wells (the proposed action); (2) 5,890 productive wells (alternative 1); and (3) 2,890 productive wells (the "no action" alternative). (AR Doc. 18, p. 1–1). Effects on surface water, groundwater, and air quality are discussed for each alternative. (*See id.,* pp. 4–4 to 4–79). Even the IBLA admitted that this EIS contains a "detailed analysis of the impacts of CBM develop-

---

4. The Wyodak EIS is titled in full, "Wyodak Coalbed Methane Project Draft Environmen-

tal Impact Statement." (*See* AR Doc. 18).

ment." *Wyoming Outdoor Council,* 156 IBLA at 359. The IBLA's problem with this EIS was that it is project-level, and thus it does not consider pre-leasing alternatives, such as issuing leases with NSO stipulations. *See id.* at 358–59.

One of the purposes of the Buffalo RMP/EIS is to analyze the suitability of lands for development of coal or oil and gas. (AR Doc. 3, p. 6). This RMP/EIS considers several pre-leasing alternatives, which include: (1) "no action"; (2) balancing environmental and economic interests; (3) favoring economic production; and (4) favoring environmental resource protection. (*See id.,* pp. 1, 15; AR Doc. 4, pp. 11–12). The environmental consequences of each alternative are thoroughly analyzed with respect to effects on air and water resources, among many other kinds of resources. (*See* AR Doc. 3, pp. 138–90). Among other options considered are provisions prohibiting surface disturbance or occupancy and provisions deferring oil and gas leasing or coal leasing. (*See id.,* pp. 20, 23–24, 26, 28–29, 39–40, 42, 44–48, 50, 52). The IBLA's objection to this RMP/EIS was that it does not consider the effects of CBM development specifically, as that was not a contemplated use in 1985, but rather considers the effects of oil and gas development generally. *See Wyoming Outdoor Council,* 156 IBLA at 357–58.

■ Therefore, the IBLA decided that because neither NEPA document alone is sufficient to enable the BLM to take a hard look, the two documents together are also insufficient. However, when the two documents are considered together, they provide the BLM with all the information it needs to take the requisite hard look before making its leasing decision. It is important to bear in mind that the BLM determined that these NEPA documents were adequate in the context of this leasing decision, not in the context of a project

proposal. While this is the very reason that the IBLA objected to the BLM's use of the Wyodak EIS, it is also the reason that the BLM satisfied its NEPA hard look obligations by viewing the two documents together.

In *Park County,* the Tenth Circuit noted that the "oil and gas lease, by itself, does not cause a change in the physical environment. In order to work the lease, the lessee must submit site-specific proposals to the Forest Service and BLM who can then modify those plans to address any number of environmental considerations." 817 F.2d at 622. The project must be sufficiently definite before an evaluation of its environmental impacts can be made and alternatives proposed. *Id.* at 624. In other words, "the specificity that NEPA requires is simply not possible absent concrete proposals." *Id.* Thus, although the NEPA hard look requirement exists at the pre-leasing stage, it is a more general requirement than at the project-level stage. The extensive and current analysis of the environmental effects of CBM development in the Wyodak EIS reasonably supplemented the pre-leasing alternatives in the Buffalo RMP/EIS so as to provide sufficient information to enable the BLM to take a hard look in this general fashion.

The IBLA's opinion arbitrarily and capriciously elevates form over substance by separating the two documents and refusing to consider them together. While the IBLA was surely pursuing the important goal of environmental protection, it may not in the process impose undue procedural burdens upon the BLM when the BLM was fully informed of the environmental consequences of its action in accordance with NEPA.

### Conclusion

For the aforementioned reasons, the decision of the IBLA is **REVERSED,** and

the decision of the BLM to issue the Leases is **REINSTATED.** Further and more specific environmental impact analysis will, of course, be appropriate upon the proposal of any specific project.