**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 10 2004**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

PENNACO ENERGY, INC.,

    Plaintiff-Appellee,

PETROLEUM ASSOCIATION OF
WYOMING; STATE OF WYOMING; NANCE
PETROLEUM CORPORATION,

    Plaintiffs-Intervenors-Appellees,

v.

UNITED STATES DEPARTMENT OF THE
INTERIOR,

    Defendant,

and

WYOMING OUTDOOR COUNCIL;
POWDER RIVER BASIN RESOURCE
COUNCIL; NATURAL RESOURCES
DEFENSE COUNCIL; DEFENDERS OF
WILDLIFE,

    Defendants-Intervenors-Appellants.

No. 03-8062

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**
**(D.C. No. 02-CV-116-CAB)**

Susan D. Daggett (Keith G. Bauerle, with her on the briefs), Earthjustice, of Denver, Colorado, for the defendants-intervenors-appellants.

Charles L. Kaiser, Davis Graham & Stubbs LLP, of Denver, Colorado (Kirby J. Iler, Pennaco Energy, Inc., of Cody, Wyoming, and Charles A. Breer, Davis Graham & Stubbs LLP, of Denver, Colorado, with him on the brief), for the plaintiff-appellee.

Patrick J. Crank, Wyoming Attorney General, Jennifer A. Golden, Deputy Attorney General, and Vicci M. Colgan and John S. Burbridge, Senior Assistant Attorneys General, Cheyenne, Wyoming, on the brief for plaintiff-intervenor-appellee State of Wyoming.

---

Before **SEYMOUR**, **EBEL**, and **BRISCOE**, Circuit Judges.

---

**BRISCOE**, Circuit Judge.

---

Plaintiff Pennaco Energy, Inc. (Pennaco), brought this suit in the District of Wyoming, pursuant to the Administrative Procedures Act, 5 U.S.C. §§ 701-06 (APA), against the United States Department of the Interior (DOI) to challenge a decision of the Interior Board of Land Appeals (IBLA). The challenged IBLA decision reversed a decision of the Bureau of Land Management (BLM) to auction three oil and gas leases (successfully bid upon by Pennaco). The IBLA concluded the requirements of the National Environmental Policy Act (NEPA) had not been satisfied prior to issuing the leases and remanded the matter to the BLM for additional appropriate action. The State of Wyoming, the Petroleum Association of Wyoming, and Nance Petroleum Corporation intervened on behalf of Pennaco in the district court. Several environmental groups intervened to defend the IBLA decision: Wyoming Outdoor Council, Powder River Basin

Resource Council, Natural Resources Defense Council, and Defenders of Wildlife (the Councils). The district court reversed the decision of the IBLA and reinstated the BLM's decision to issue the leases. The Councils bring this appeal. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and reverse and remand.

**I**.

The factual and procedural background of this case is best understood in the context of the relevant statutes and regulations.

*National Environmental Policy Act*

The NEPA, 42 U.S.C. §§ 4321-70, "prescribes the necessary process" by which federal agencies must "take a 'hard look' at the environmental consequences" of the proposed courses of action. Utahns for Better Transp. v. U.S. Dept. of Transp., 305 F.3d 1152, 1162-63 (10th Cir. 2002). "[T]he statute does not impose substantive limits on agency conduct." Friends of the Bow v. Thompson, 124 F.3d 1210, 1213 (10th Cir. 1997) (citing Robertson v. Methow Valley Citizens' Council, 490 U.S. 332, 350 (1989)). "Rather, once environmental concerns are 'adequately identified and evaluated' by the agency, NEPA places no further constraint on agency actions." Id. (quoting Robertson, 490 U.S. at 350).

For proposed "major Federal actions significantly affecting the quality of the human environment," agencies must prepare an environmental impact statement (EIS) in which they consider the environmental impact of the proposed action and compare this

3

impact with that of "alternatives to the proposed action." See 42 U.S.C. § 4332(2)(C). In order to provide "a clear basis for choice among options by the decisionmaker and the public," an agency's EIS must consider the "no action" alternative. 40 C.F.R. § 1502.14; see id. (d) (EIS shall "[i]nclude the alternative of no action").

"Agencies 'need not prepare a full EIS,' however, if they initially prepare the less detailed environmental assessment ('EA') and, based on the EA, issue a 'finding of no significant impact' ('FONSI'), concluding that the proposed action will not significantly affect the environment." Lee v. United States Air Force, 354 F.3d 1229, 1237 (10th Cir. 2004) (quoting S. Utah Wilderness Alliance v. Norton, 301 F.3d 1217, 1237 (10th Cir. 2002)); see also 40 C.F.R. § 1501.4 (providing the agency shall prepare an EA to determine whether an EIS is required). Further, an agency need not prepare a new EIS to address a proposed action as long as it already has taken a "hard look" at the action's potential environmental consequences. See Kleppe v. Sierra Club, 427 U.S. 390, 410, n.21 (1976) (stating "[t]he only role for a court is to insure that the agency has taken a 'hard look' at environmental consequences"); Hodges v. Abraham, 300 F.3d 432, 448-49 (4th Cir. 2002) (concluding new NEPA documents not required when proposed action did not create "new environmental picture from that previously studied" and previous NEPA documents allowed agency to take "hard look" at potential environmental impacts of proposed action); Park County Res. Council, Inc. v. United States Dep't of Agric., 817 F.2d 609, 620 (10th Cir. 1987) ("NEPA requires only that an agency take a 'hard look' at

4

the environmental consequences of any major federal action.").

Regulations require agencies to supplement an existing EIS through a Supplemental Environmental Impact Statement (SEIS) when "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns," 40 C.F.R. § 1502.9(c)(1)(i), or when "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." Id. § 1502.9(c)(1)(ii).

Courts have upheld the use of non-NEPA procedures "for the purpose of determining whether new information or changed circumstances require the preparation of a supplemental EA or EIS." Idaho Sporting Cong. Inc. v. Alexander, 222 F.3d 562, 566 (9th Cir. 2000); see, e.g., Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 383-85 (1989) (upholding decision of Army Corps of Engineers to proceed with dam project without supplementing existing NEPA documents, where Corps used a "supplemental information report" to analyze significance of new reports questioning environmental impact of project); Friends of the Bow, 124 F.3d at 1218-19 (upholding decision of Forest Service to proceed with logging project without supplementing existing NEPA documents where agency used supplemental information report to evaluate significance of new information about area to be logged).

*Oil and gas leasing decisions*

The DOI manages the use of federal oil and gas resources through a three-phase

5

decision-making process. At the earliest and broadest level of decision-making, the DOI develops land use plans–often referred to as resource management plans (RMPs). See Norton v. S. Utah Wilderness Alliance, 124 S. Ct. 2373, 2377 (2004) (citing 43 C.F.R. § 1601.0-5(k)). "Generally, a land use plan describes, for a particular area, allowable uses, goals for future condition of the land, and specific next steps." Id. Under the Federal Land Policy and Management Act (FLPMA), "[t]he Secretary [of Interior] shall manage the public lands under principles of multiple use and sustained yield, in accordance with the land use plans . . . when they are available." 43 U.S.C. § 1732(a).

Once an RMP has been issued, "subsequent more detailed or specific planning, shall conform to the [RMP]." 43 C.F.R. § 1610.5-3(a). In the context of oil and gas development, the BLM is initially charged with determining whether the issuance of a particular oil and gas lease is consistent with the RMP. The lessee must obtain BLM approval of an Application for Permit to Drill (APD) before commencing any "drilling operations" or "surface disturbance preliminary thereto." 43 C.F.R. § 3162.3-1(c).

## II.

*BLM's decision to auction leases*

At issue in this case is whether the BLM satisfied the NEPA prior to auctioning three oil and gas leases on February 1, 2000, for the development of tracts of land in the

6

Powder River Basin in Wyoming.[1]  In August 1999, interested parties nominated 49

parcels of land for inclusion in the next available oil and gas lease sale.  It is undisputed

that the planned use of the leases was the extraction of coal bed methane (CBM).  It is

also undisputed that a CBM exploration and development boom is occurring in the

Powder River Basin.  The hotly contested issue underlying this case is whether the

environmental impacts of CBM development are significantly different than the

environmental impacts of non-CBM oil and gas development.

On September 28, 1999, Richard Zander, the acting field manager of the BLM

Buffalo Field Office, prepared separate but identical Interim Documentation of Land Use

Conformance and NEPA Adequacy worksheets (DNAs) for each of the 49 nominated

parcels.  DNAs are forms designed to allow BLM employees to determine whether they

properly can rely on existing NEPA documents.  In this case, Zander concluded that two

existing NEPA analyses (the Buffalo Resource Management Plan EIS (Buffalo RMP EIS)

and the Wyodak Coal Bed Methane Project Draft EIS (Wyodak DEIS)) satisfied the

NEPA requirements with regard to issuance of the leases.

The first document relied upon by Zander, the Buffalo RMP EIS, was published in

October 1985 in conjunction with the development of the Buffalo RMP.  In the Buffalo

---

[1]      The three parcels at issue in this case are designated WY-0002-082, WY-
0002-092, and WY-0002-93.  Wyoming Outdoor Council, 156 I.B.L.A. 347, 359, n.1
(Dep't Interior Apr. 26, 2002).  Pennaco has attached to its supplemental brief a
memorandum by Richard Zander dated July 6, 2004, indicating that as of that date no
drilling activities had taken place on the tracts.  Aplee. Supp. Br. at 1; Ex. 4.

RMP EIS, the BLM discussed the potential environmental impacts of oil and gas development within the Buffalo Resource Area, an area encompassing the three parcels at issue in this case. However, the Buffalo RMP EIS did not specifically address CBM extraction.

The second document relied upon by Zander, the Wyodak DEIS, was published in May 1999. Unlike the Buffalo RMP EIS, the Wyodak DEIS addressed the potential environmental impacts of CBM mining. However, as the Wyodak DEIS was a *post*-leasing project level study, the BLM did not consider whether leases should have been issued in the first place. Further, the geographic scope of the Wyodak DEIS did not encompass two of the three parcels at issue in this case.

Having concluded the NEPA requirements were satisfied in regard to the proposed leases, Zander further concluded that issuance of the leases conformed to the Buffalo RMP. Thus, the BLM auctioned the leases at a competitive sale on February 1, 2000, and Pennaco was the successful bidder.[2]

On January 27, 2000, the Wyoming Outdoor Council (WOC) and the Powder River Basin Resource Council (PRBRC) filed a formal protest with the BLM, alleging the "environmental impacts of CBM development and extraction are not comparable to the impacts of other oil and gas development." Aplt. App. VI, Doc. 22 at 3. Given the

---

[2]    It is undisputed that the oil and gas leases at issue conveyed the right to extract coal bed methane. "Gas" has been interpreted by the Supreme Court to include coal bed methane gas. See Amoco Prod. Co. v. S. Ute Indian Tribe, 526 U.S. 865 (1999).

alleged differences between CBM extraction and conventional oil and gas extraction, WOC and PRBRC argued that the BLM was required by NEPA to prepare a new EIS before issuing the leases. More generally, WOC and PRBRC argued the BLM had failed to take a "hard look" at the potential environmental impacts of issuing the leases. On April 7, 2000, the BLM's acting deputy state director dismissed the protest as "unfounded." Aplt. App. VI, Doc.23 at 3. The decision stated:

> The BLM disagrees with your assertion that the production of coal bed methane is significantly different from the production of other methane, i.e., natural gas, or that the production of coal bed methane has a unique production problem because of produced water. . . .
> , , ,
> . . .The BLM has taken a "hard look" at the environmental effects and, through its NEPA analyses, has ensured that it is fully informed regarding the environmental consequences of the action.

Id. at 1-2.

*IBLA decision*

WOC and PRBRC timely appealed the decision of the BLM to the IBLA. As an initial matter, the IBLA dismissed the appeal as to 46 of the 49 leases for lack of standing. As to the other three leases (the three at issue in this case), the IBLA stayed the BLM's decision pending its own final decision. Wyoming Outdoor Council, 153 I.B.L.A. 379 (Dep't Interior Oct. 6, 2000). Ultimately, as to the remaining three leases, the IBLA reversed the decision of the BLM and remanded to the BLM for "additional appropriate action." Wyoming Outdoor Council, 156 I.B.L.A. 347, 359 (Dep't Interior Apr. 26, 2002).

9

The primary issue addressed by the IBLA was whether the BLM correctly determined that existing NEPA documentation "adequately analyzed the environmental effects of the proposed inclusion of the affected parcels in the February 2000 competitive lease sale or whether the agency violated NEPA by failing to undertake additional site-specific environmental reviews before deciding to offer the parcels for oil and gas leasing." Id. at 357. The BLM and Pennaco, as an intervenor, contended the NEPA was satisfied by existing NEPA documents, namely the Buffalo RMP EIS and the Wyodak DEIS.

The IBLA concluded the Buffalo RMP EIS was inadequate because it "did not specifically discuss CBM extraction and development, which were not contemplated uses in 1985, although they are the planned uses for the leases issued for the disputed parcels." Id. at 358. The IBLA rejected the BLM's position "that the techniques and impacts associated with CBM extraction and production are not significantly different from those analyzed in the Buffalo RMP/EIS." Id. Further, the IBLA stated:

> We find . . . that not only does the record amply demonstrate that the
> magnitude of water production from CBM extraction in the Powder River
> Basin creates unique problems and that CBM development and
> transportation present critical air quality issues not adequately addressed in
> the RMP/EIS, but BLM itself has also acknowledged the inadequacy of the
> RMP/EIS as far as the analysis of CBM issues is concerned. . . . Because
> the Buffalo RMP/EIS failed to take the requisite hard look at the impacts
> associated with CBM extraction and development, which clearly are
> relevant matters of environmental concern in this case, BLM could not rely
> on that document to satisfy its NEPA obligations for the proposed leasing
> decisions at issue here.
>     In apparent recognition of the deficiencies in the Buffalo RMP/EIS,

10

BLM also relies on the October 1999 Wyodak Final EIS . . . . The Wyodak EIS is a project-level EIS designed to analyze the impacts of developing Federal CBM properties by drilling, completing, operating, and reclaiming approximately 5,000 new productive CBM wells and related production facilities in the eastern Powder River Basin within Campbell and parts of Converse, Johnson, and Sheridan Counties, Wyoming. Since leases authorizing surface occupancy had already been issued for the lands involved in the proposed action, the Department lacked the authority to deny all Federal drilling activity based on environmental concerns unrelated to threatened or endangered species. . . . Given that the leasing decisions had already been made and the leases issued, the EIS did not consider reasonable alternatives available in a leasing decision, including whether specific parcels should be leased, appropriate lease stipulations, and NSO [no surface occupancy] and non-NSO areas. Thus, despite the Wyodak EIS' detailed analysis of the impacts of CBM development, which we note parenthetically undercuts BLM's claim that the impacts of CBM extraction are the same as those of other methane production, that document's failure to consider reasonable alternatives relevant to a pre-leasing environmental analysis fatally impairs its ability to serve as the requisite pre-leasing NEPA document for these parcels.

Since the existing NEPA documents relied upon by BLM, whether viewed separately or taken together, do not constitute the requisite hard look at the environmental consequences of the proposed action, BLM was required to conduct further NEPA analysis before deciding whether to approve the sale of the parcels at issue. The [DNAs], dependent as they were on the Buffalo EIS/RMP and the Wyodak EIS, fail to even identify, much less independently address, any of the relevant areas of environmental concern or reasonable alternatives to the proposed action and thus do not satisfy BLM's NEPA obligations in this case.

Id. at 358-59 (footnotes omitted).[3]

While this case was pending in the district court, the BLM petitioned the IBLA for

_____

[3]     In the DNAs, Zander identified the Wyodak *Draft* EIS and the Buffalo RMP EIS as the relevant NEPA documents. The Wyodak *Final* EIS was published in October 1999, several months prior to lease auction, and largely incorporated the Wyodak DEIS by reference. Both documents were in the administrative record before the IBLA, and it appears that the IBLA referred to them collectively as the Wyodak EIS.

11

reconsideration. The IBLA denied the petition, stating:

> The issue in this case was not whether BLM was required to evaluate the impacts of full field development in an EIS before issuing the challenged leases; rather, the question was whether the existing NEPA documents were sufficient to provide the requisite pre-leasing NEPA analysis for the sale of the affected parcels in light of the probable use of the parcels for CBM development. We concluded that significant omissions in both the Buffalo RMP/EIS and the Wyodak EIS precluded BLM from relying solely on those documents to satisfy its NEPA obligations.

Wyodak Outdoor Council, 157 I.B.L.A. 259, 262 (Dep't of Interior Oct. 15, 2002).

*District court decision*

Pennaco appealed the IBLA's decision to the District Court of Wyoming. The district court reversed the IBLA's decision and reinstated the decision of the BLM. The district court concluded the Wyodak EIS and the Buffalo RMP EIS, taken together, were sufficient to satisfy NEPA. Further, the district court concluded "[t]he IBLA's opinion arbitrarily and capriciously elevates form over substance by separating the two documents and refusing to consider them together." Pennaco Energy, Inc. v. U.S. Dep't of Interior, 266 F. Supp. 2d 1323, 1330 (D. Wyo. 2003).

**III.**

*Subject matter jurisdiction*

As an initial matter, we must determine whether we have jurisdiction over this case. Section 704 of the APA provides that an agency action is "subject to judicial review" when it is either: (1) "made reviewable by statute," or (2) a "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. In this case, the

12

plaintiffs have not identified any statute, other than the APA, that provides for judicial review of the IBLA's decision. Therefore, the IBLA's decision is only reviewable if it is a "final agency action." See United Tribe of Shawnee Indians v. United States, 253 F.3d 543, 549 (10th Cir. 2001). At oral argument, we raised the issue of whether the IBLA's decision constituted final agency action and asked the parties to submit supplemental briefs. In their briefs, both parties argue the IBLA's decision constitutes final agency action. Having reviewed the briefs, we agree that we have jurisdiction.[4]

"Whether federal conduct constitutes final agency action within the meaning of the APA is a legal question." Colorado Farm Bureau Fed'n v. U.S. Forest Serv., 220 F.3d 1171, 1173 (10th Cir. 2000).

> As a general matter, two conditions must be satisfied for agency action to be "final": First, the action must mark the "consummation" of the agency's decisionmaking process, . . . it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.

Bennett v. Spear, 520 U.S. 154, 177-78 (1997) (internal quotations omitted). We conclude the IBLA's decision marked the consummation of a distinct decision-making

---

[4] "On every writ of error or appeal the first and fundamental question is that of jurisdiction, first, of this court, and then of the court from which the record comes. This question the court is bound to ask and answer for itself, even when not otherwise suggested." Mansfield, C. & L.M. Ry. Co. v. Swan, 111 U.S. 379, 382 (1884). "Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." Fed. R. Civ. Proc. 12(h)(3)

process. Although the IBLA did not make a final determination as to what NEPA required, the IBLA's decision was a definitive statement of its position that the environmental analyses already prepared by the BLM were not adequate. The IBLA's conclusion on that point was neither tentative nor interlocutory in nature. Compare F.T.C. v. Standard Oil Co. of California, 449 U.S. 232, 241 (1980) (FTC issuance of "complaint" stating Commission had reason to believe Standard Oil had violated Federal Trade Commission Act was "threshold determination" that served only to initiate adjudicatory proceedings and thus was not a final agency determination). The second requirement is also satisfied. Definite legal consequences flowed from the IBLA's decision, namely that Pennaco's development of the leased tracts is delayed until the BLM has prepared additional unspecified NEPA documentation.

*Standard of review*

"We afford no particular deference to the district court's review of an agency action; our review of the administrative record pertaining to the challenged action is independent." Colo. Envtl. Coalition v. Dombeck, 185 F.3d 1162, 1167, n.5 (10th Cir. 1999). Instead, we defer "to the decisions of the [IBLA], and we will set aside an IBLA decision only if it is arbitrary, capricious, otherwise not in accordance with law, or not supported by substantial evidence." IMC Kalium Carlsbad, Inc. v. Bd. of Land Appeals,

14

206 F.3d 1003, 1009 (10th Cir. 2000) (internal quotation omitted).[5]

Under the arbitrary and capricious standard, we must determine whether the agency considered all relevant factors and whether there has been a clear error of judgment. IMC Kalium Carlsbad, 206 F.3d at 1012. "In addition to requiring a reasoned basis for agency action, the 'arbitrary or capricious' standard requires an agency's action to be supported by the facts in the record." Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1575 (10th Cir. 1994). Thus, agency action, whether it is classified as "formal" or "informal," will be set aside as arbitrary unless it is supported by "substantial evidence" in the administrative record. Id.

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 2003) (internal quotation omitted). "This is something more than a mere scintilla but something less than the weight of the evidence." Foust v. Lujan, 942 F.2d 712, 714 (10th Cir. 1991) (discussing "substantial evidence" standard). "Evidence is generally substantial under the APA if it is enough to justify, if the trial were to a jury, refusal to direct a verdict on a factual conclusion." Hoyl v. Babbitt, 129 F.3d 1377, 1383 (10th Cir.

---

[5] The IBLA issues the DOI's final and binding decision, not the BLM. See IMC Kalium Carlsbad, 206 F.3d at 1009-10. Further, "[t]he IBLA has de novo review authority over BLM decisions." IMC Kalium Carlsbad, 206 F.3d at 1009. Therefore, although we "examine" both the BLM's and the IBLA's decisions, the deferential standard of review is applied to the decision of the IBLA.

15

1997). [6]

This case requires us to apply the arbitrary and capricious standard of review to an IBLA decision very limited in its sweep. The IBLA did not determine what the NEPA required, but only that existing NEPA analyses were not sufficient to allow the BLM to take a "hard look" at the environmental impacts of the proposed CBM development. Therefore, the narrow question before us is whether the IBLA acted arbitrarily and capriciously in deciding that the leases at issue should not have been issued before additional NEPA documentation was prepared.

*Application of arbitrary and capricious standard*

We conclude the IBLA gave due consideration to the relevant factors and that the IBLA's conclusion was supported by substantial evidence in the administrative record. To determine whether additional NEPA documents were needed, the IBLA was required to consider whether existing NEPA documents were sufficient to allow the agency to take a "hard look" at the environmental impacts of CBM development on the three parcels at issue. Appropriately, the IBLA's decision turned on its answer to that precise question. Further, the administrative record contains substantial evidence to support the IBLA's conclusion that the proposed action raised significant new environmental concerns that

---

[6] When the arbitrary or capricious standard is performing that function of assuring factual support, there is no substantive difference between what it requires and what would be required by the substantial evidence test, since it is impossible to conceive of a nonarbitrary factual judgment supported only by evidence that is not substantial in the APA sense. See Olenhouse, 42 F.3d at 1575.

16

had not been addressed by existing NEPA documents.

The district court characterized the evidence cited by the IBLA as "not reliable" and "dubious." Pennaco, 266 F. Supp. 2d at 1329. Similarly, on appeal, Pennaco argues the IBLA failed to cite substantial evidence to support its decision. Our review of the record is not, as Pennaco suggests, limited to those passages expressly relied upon by the IBLA. To the contrary, in determining whether the IBLA's decision was arbitrary and capricious, we are required to "review the *whole record* or those parts cited by a party." 5 U.S.C. § 706 (emphasis added).

As Pennaco correctly notes, "an agency's action must be upheld, if at all, on the basis articulated by the agency itself." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 50 (1983). We follow that rule in this case by declining to consider the Councils' contention that groundwater brought to the surface during CBM extraction contains high sodium levels. Although there may be evidence in the record supporting that contention, the IBLA's remand was based on its concerns about water quantity and air quality and not on any concern about water quality.[7] On the other hand, we do not agree that our review of the record for evidence in support of the IBLA's stated rationale is limited to materials specifically cited by the IBLA.

―――――――――――――

[7] It should not be inferred from our decision that the BLM is free to disregard water quality issues on remand. To the contrary, the BLM must comply with the NEPA, and the NEPA requires the BLM to consider the full environmental impact and any unavoidable adverse environmental effects of the proposed action. See 42 U.S.C. § 4332(2)(C).

17

We begin our review of the record with an affidavit which the IBLA did not rely upon but which Pennaco contends is very significant. In support of its position that the Buffalo RMP EIS, by itself, satisfies NEPA, Pennaco relies primarily on a December 2000 affidavit by Zander. In his affidavit, Zander states that "CBM well requirements and impacts fall within the range of those for other oil and gas wells." Aplt. App. V, Doc. 20 at 5. Further, Zander avers that "CBM wells produce substantial water, but much less than that asserted by Appellants in this proceeding." Id. at 6. According to Zander, some CBM wells produce less water than some conventional oil and gas wells. In support of its argument that the IBLA acted arbitrarily and capriciously, Pennaco contends the IBLA ignored Zander's purportedly uncontroverted affidavit.

The IBLA specifically referred to the Zander affidavit, noting Pennaco's contention that "CBM activities are not unique but fall within the range of those for other oil and gas wells." Wyoming Outdoor Council, 156 IBLA at 354. Further, Zander's affidavit is not uncontroverted. Zander's own 1990 internal BLM memorandum, which the IBLA did rely upon, described CBM development as a "non-traditional type of oil and gas activity" that "was not considered" in the Buffalo RMP EIS. Aplt. App. I, Doc. 4 at 162. Further, in its 2002 budget request (another piece of evidence relied upon by the IBLA), the BLM asserted that existing NEPA documents were not adequate to address the environmental impacts of CBM development.

There is additional evidence in the record, not cited by the IBLA, that the BLM

18

previously had concluded existing NEPA analyses were not adequate to address the impacts of CBM development. In a September 6, 2001, statement to Congress, BLM assistant secretary Tom Fulton stated:

> While [CBM] development on the public lands occurs in several western states, a dramatic increase in new [CBM] exploration and development is occurring in the Powder River Basin in Wyoming. Currently in Wyoming, there are more than 5,500 CBM-producing wells under an EIS completed in 1999 and a supplemental drainage environmental assessment completed in 2001. At the time of the original EIS, no one anticipated or planned for the rapid development of this resource. Consequently, there is a need for a new EIS which is currently scheduled for completion in May 2002, with a Record of Decision expected in July 2002. This EIS will analyze the effects of the drilling of 50,000 CBM wells, and 3,000 conventional oil and gas wells, expected to be drilled in the next 10 years.

Id., Vol. V, Doc. 21 at 1264-65.

*Water Quantity*

The administrative record also contains evidence to support the IBLA's conclusion that water production associated with CBM extraction is significantly greater than water production associated with non-CBM oil and gas development. The Buffalo RMP Draft EIS, in addressing non-CBM development, stated that the "[m]ining would have little effect on regional groundwater systems." Id., Vol. VII, Doc. 28 at 1520.[8] Further, the Buffalo RMP Draft EIS predicted the effects of non-CBM development on water

---

[8]     The Final Buffalo RMP EIS incorporated by reference most of the material presented in the Buffalo RMP Draft EIS. Most pertinent for our purposes, the Draft EIS chapter on environmental consequences was adopted by the Final EIS, with the exception of specifically noted corrections that are not relevant to this case.

19

resources would be the same if no development was undertaken. In comparison, there is ample evidence in the record that the process of CBM extraction involves bringing significant amounts of groundwater to the surface. A March 1990 EA for Eastern Campbell and Western Johnson Counties, Wyoming, estimated that water production rates associated with CBM projects could be up to 2,000 barrels per day per well (1 barrel equals 42 gallons). The Wyodak DEIS projected CBM related water flow based on an estimated average discharge of 12 gallons per minute of water per well, or 17,280 gallons per day, per well. In the Wyodak DEIS, the BLM discussed the potential for flooding and erosion related to waterflow from CBM development.

> In his statement to Congress, Fulton stated:
>
> The CBM extraction process involves pumping water from the coal seams to the surface in order to reduce the water pressure that traps the gas in the coal. This releases the methane. Managing the water produced with methane is a challenge to the oil and gas industry, as well as Federal and State regulators. We must work together to find innovative solutions to address the surface water issues and the potential impacts to the entire land and water system.

Id., Vol. V., Doc. 21 at 1266-67. Further, the IBLA cited several newspaper articles that addressed the potential impacts of CBM development. Some of the articles addressed concerns associated with the drawing of large quantities of sub-surface water to the surface during the CBM extraction process. Pennaco cites United States v. Harris, 271 F.3d 690, 696 (7th Cir. 2001), for the proposition that newspapers may not be used as sources for scientific data. However, Harris is not analogous to this case. Harris was a

20

direct appeal of a criminal conviction in which the court concluded newspaper articles that were never presented to the jury could not be used to attack the sufficiency of evidence that was presented to the jury. In contrast, the APA "renders admissible any 'oral or documentary evidence' except 'irrelevant, immaterial, or unduly repetitious evidence.'" Bennett v. Nat'l Transp. Safety Bd., 66 F.3d 1130, 1137 (10th Cir. 1995) (quoting 5 U.S.C. § 556(d)). Pennaco does not contend that the newspaper articles cited by the IBLA are irrelevant, immaterial, or unduly repetitious.

Moreover, Zander's affidavit falls short of unequivocally establishing that the BLM complied with the NEPA prior to issuing the leases. Although Zander concludes in his affidavit that the impacts of CBM development are equivalent to the impacts of non-CBM oil and gas development, no such conclusion was recorded in any NEPA document prior to the issuance of the leases. Although Zander averred almost ten months after the lease sale that the BLM took a "hard look" at the potential environmental impacts of issuing the leases and determined that issuing the leases "would not have a significant effect upon the quality of the environment," Aplt. App. V, Doc. 20 at 11, an EA was not prepared in connection with the leases prior to the auction and no FONSI was issued. Zander's affidavit is a post hoc analysis that does not satisfy the NEPA. Agencies are required to satisfy the NEPA "before committing themselves irretrievably to a given course of action, so that the action can be shaped to account for environmental values." Sierra Club v. Hodel, 848 F.2d 1068, 1093 (10th Cir. 1988)

21

After reviewing the entire record, we conclude it contains substantial evidence to support the IBLA's conclusion that CBM development poses unique environmental concerns related to water discharge that were not addressed by the Buffalo RMP EIS. The fact that the administrative record contains some evidence arguably contrary to the IBLA's findings (such as the Zander affidavit) does not render the IBLA's decision arbitrary and capricious. On review of an agency's decision, this court's "function is not to weigh the evidence or evaluate the witnesses' credibility." Sorenson v. Nat'l Transp. Safety Bd., 684 F.2d 683, 685 (10th Cir. 1982).

*Air Quality*

We further conclude the record contains substantial evidence to support the IBLA's conclusion that CBM development poses unique environmental concerns related to air quality that were not addressed in the Buffalo RMP EIS. The Buffalo RMP DEIS predicted the effects of non-CBM oil and gas development on air quality would be the same as if no development was undertaken. In comparison, the Wyodak DEIS predicted the operation of natural-gas fired compressors, required to move CBM gas from the wellhead to pipelines, would release a number of emissions. Although the Wyodak DEIS predicted that most of the emissions would not significantly impact air quality, it acknowledged the incomplete combustion of natural gas would result in the emission of formaldehyde, a known carcinogen. The Wyodak DEIS characterized the emission of formaldehyde as a "risk" and recommended steps to minimize the risk.

22

*The Wyodak EIS*

Pennaco's alternative position is that the Wyodak EIS cured any deficiencies in the Buffalo RMP EIS.  In some circumstances, agencies may satisfy the NEPA by looking at multiple documents.  See Nat'l Indian Youth Council v. Watt, 664 F.2d 220, 228 (10th Cir. 1981) (holding various NEPA documents, taken together, "adequately inform[ed] the Secretary [of the Interior] of the [mining] project's potential effect on the human environment" and, therefore, there was no "substantial procedural" reason to set aside the Secretary's decision); see also 40 C.F.R. § 1502.21 ("Agencies shall incorporate material into an environmental impact statement by reference when the effect will be to cut down on bulk without impeding agency and public review of the action.").

In this case, the IBLA concluded the Wyodak EIS had one significant shortcoming.  The Wyodak EIS was a post-leasing analysis and, therefore, the BLM did not consider pre-leasing options, such as not issuing leases at all.  In the Wyodak EIS, the BLM acknowledged its limited discretion in regard to the Wyodak project. The Wyodak EIS provides:

> None of the stipulations imposed (on the leases within the project area) would empower the Secretary of the Interior to deny all drilling activity because of environmental concerns where leases have been issued with surface occupancy rights.
> Provisions that expressly provide Secretarial authority to deny or restrict lease development in whole or in part would depend on an opinion provided by the U.S. Fish and Wildlife Service (USFWS) regarding impacts to endangered or threatened species or habitats of species that are listed or proposed for listing.

Aplt. App. IV, Doc. 8 at 750.  This language reflects that lessees already had acquired certain rights, subject only to stipulations contained in their leases.  Similarly, 43 C.F.R. § 3101.1-2 provides:

> A lessee shall have the right to use so much of the leased lands as is necessary to explore for, drill for, mine, extract, remove and dispose of all the leased resource in a leasehold subject to: Stipulations attached to the lease; restrictions deriving from specific, nondiscretionary statutes; and such reasonable measures as may be required by the authorized officer to minimize adverse impacts to other resource values, land uses or users not addressed in the lease stipulations at the time operations are proposed. To the extent consistent with lease rights granted, such reasonable measures may include, but are not limited to, modification to siting or design of facilities, timing of operations, and specification of interim and final reclamation measures.

The BLM Handbook for Planning for Fluid Mineral Resources puts it this way:

> The BLM has a statutory responsibility under NEPA to analyze and document the direct, indirect and cumulative impacts of past, present and reasonably foreseeable future actions resulting from Federally authorized fluid minerals activities.  By law, these impacts must be analyzed before the agency makes an irreversible commitment.  In the fluid minerals program, this commitment occurs at the point of lease issuance.  Therefore, the EIS prepared with the RMP is intended to satisfy NEPA requirements for issuing fluid mineral leases.

Aplt. App. VI, Doc. 26 at 1338.  Therefore, in light of the Wyodak EIS' failure to consider the pre-leasing options, we conclude the IBLA did not act arbitrarily and capriciously in deciding that the Wyodak EIS did not adequately supplement the Buffalo RMP EIS.[9]

---

[9]    A Draft EIS for the Powder River Basin Oil and Gas Project was published in January 2002, and a Powder River Basin *Final* EIS was published in January 2003.

Finally, we note that Pennaco relies heavily on Park County, 817 F.2d 609. In Park County, the plaintiffs (environmental interest groups) claimed the BLM "unlawfully issued an oil and gas lease, and thereafter unlawfully approved an [APD] filed by the Marathon Oil Company, in contravention of . . . NEPA." Id. at 612. In recounting the facts, we noted that prior to issuing the lease in question the BLM had prepared an "extensive" EA which addressed the "issuance of federal oil and gas leases" in the Shoshone National Forest where the tract at issue was located. Id. The EA exceeded 100 pages and addressed various leasing alternatives, including "issuance of no leases." Id. The EA concluded that merely issuing the leases would create no environmental impacts, and a FONSI was issued with respect to the lease issuance. Approximately three years after issuance of the FONSI and the sale of the lease, Marathon submitted an APD. In response, the BLM and the Forest Service prepared a comprehensive EIS with respect to the drilling application.

The Park County plaintiffs challenged both the adequacy of the pre-drilling EIS and issuance of the oil and gas lease prior to preparation of an EIS. We concluded

---

According to Pennaco, the adequacy of the Powder River Basin Final EIS is being challenged by the Wyoming Outdoor Council in the Montana and Wyoming District Courts. In this case, because the Powder River Basin DEIS and EIS were published years *after* the BLM issued the leases, we need not take those documents into account in reviewing the IBLA's conclusion that the NEPA was not satisfied *prior* to the issuance of the leases.

plaintiffs' challenge to the adequacy of the pre-drilling EIS had been rendered moot by the lessee's development and subsequent abandonment of the site in question. On the other hand, we concluded the challenge to issuance of the lease was not moot because the lease remained operative. We employed a *reasonableness* standard to review the BLM's issuance of a FONSI and concluded:

> *[I]n light of the substantial EA*, of the mitigating lease restrictions requiring further environmental appraisal before any surface disturbing activities commence, of the nebulousness of future drilling activity at the time of leasing, and of the continuing supervision of the federal agencies involved over future activities, the agency's decision in this case that the lease issuance itself was not a major federal action significantly affecting the quality of the human environment was not unreasonable.

Id. at 624 (emphasis added).

Park County has been overruled to the extent it held that a reasonableness standard of review should be used when reviewing an agency's decision to not prepare an EIS. In Marsh, 490 U.S. at 385, the Court held that an agency's decision to not prepare an EIS or to not supplement an existing EIS should only be reversed when it is arbitrary and capricious. See also Village of Los Ranchos de Albuquerque v. Marsh, 956 F.2d 970, 972-73 (10th Cir. 1992) (recognizing Park County was overruled, in part, by Marsh). Nevertheless, according to Pennaco, Park County is controlling. Pennaco argues "[t]he analyses on which BLM relied here far exceed that which passed muster in Park County." Aplee. Br. at 28.

This case differs significantly from Park County. First, in Park County, plaintiffs

challenged an agency decision to issue an oil and gas lease prior to preparation of a comprehensive EIS. We concluded that the BLM's decision to not prepare an EIS at the leasing stage was "not unreasonable." In comparison, the question before us is *not*, as Pennaco suggests, whether the documents relied upon by the BLM pass muster. The central issue is whether the IBLA's determination that the documents did not "pass muster" was arbitrary and capricious. In Park County, this court did not conclude the agency would have abused its discretion if it decided that an EIS was necessary at the pre-leasing stage.

Moreover, in Park County, we relied in part on the fact that the BLM issued a FONSI after having prepared an "extensive" EA that addressed the potential environmental impacts of issuing the leases and considered the option of not issuing leases. In comparison, in this case, the BLM did not prepare such an EA, did not issue a FONSI, and did not prepare any environmental analysis that considered not issuing the leases in question. Instead, the BLM determined, after filling out DNA worksheets, that previously issued NEPA documents were sufficient to satisfy the "hard look" standard. DNAs, unlike EAs and FONSIs, are not mentioned in the NEPA or in the regulations implementing the NEPA. See 40 C.F.R. § 1508.10 (defining the term "environmental document" as including environmental assessments, environmental impact statements, findings of no significant impact, and notices of intent). As stated, agencies may use non-NEPA procedures to determine whether new NEPA documentation is required. For

reasons discussed above, however, we conclude the IBLA's determination that more analysis was required in this case was not arbitrary and capricious.

## IV.

We REVERSE and REMAND to the district court with instructions to reinstate the IBLA's decision.